## SHERMAN SHOWN v. STATE.

No. A-797.   Opinion Filed April 27, 1912.

(123 Pac. 437.)

1. **LARCENY—Evidence—Sufficiency.** In a prosecution for horse stealing, the evidence is held to support the verdict, and that no reversible error was committed on the trial.

2. **NEW TRIAL—Insufficiency of Evidence.** A new trial will not be granted for insufficiency of the evidence, or where the evidence is conflicting. These questions being within the discretion of the trial court, its decision will not be disturbed on appeal, unless it appears that the trial court abused its discretion touching these matters.

(Syllabus by the Court.)

*Appeal from District Court, Garfield County;*
*M. C. Garber, Judge.*

Sherman Shown was convicted of horse stealing, and appeals. Affirmed.

Plaintiff in error, Sherman Shown, a resident of Oklahoma City, was prosecuted by information filed October 25, 1909, in the district court of Garfield county for the crime of stealing a bay gelding, the property of A. Plumley. The information jointly charged Lee Terry with the crime. The case was dismissed as to Terry, and he was used as a witness for the state. The larceny was alleged to have occurred on the 7th day of July, 1909. Trial was had December, 1909, and the jury found Sherman Shown guilty, but failed to assess the punishment. December 21, 1909, the court pronounced judgment on the verdict and sentenced defendant to imprisonment for a term of five years in the state penitentiary.

The proof on the part of the prosecution, briefly stated, is as follows:

A. Plumley testified that he was a resident of Enid, and was the owner of a large bay gelding, weighing about 1,400 pounds, worth about $200; that on the night of July 7, 1909, the

horse was stolen from his barn lot; that the next time he saw his horse was October 22, 1909, at the home of a man named Hubatke, who lived about fifteen miles southwest of Oklahoma City; that he met the defendant Sherman Shown the first time near the courthouse in Oklahoma City the day he was arrested by Sam Campbell, sheriff of Garfield county; that the defendant then said that he had owned this horse, but that he had traded him off, did not know just exactly where the horse was, but that he believed that he could get the horse; that Sheriff Campbell asked him how long it would take, and the defendant said he thought it would probably take two hours or probably two days, or probably he never could get him, but that if the sheriff would let him go he would make an effort to get the horse. The sheriff let him go for two days. He failed to find the horse, and the sheriff brought him on to Enid. The defendant stated that he had traded the horse off to a man by the name of Lum Deaton.

F. B. Owens testified that he lived in Enid about two blocks from A. Plumley; that on the night of July 7, 1909, a black gelding was stolen out of his barn in Enid, and two or three weeks later he found his horse in the possession of Mr. W. T. Hales in Oklahoma City.

Lee Terry testified that he lived at Oklahoma City and was the same Lee Terry who was jointly informed against with Sherman Shown; that on the 4th day of July he was at Sherman Shown's barn on West California street in Oklahoma City; that there was present at the time Sherman Shown, John Lee, and witness; that at that time the defendant Shown made a proposition to John Lee and witness to go to Kingfisher or Enid and steal some horses and bring them back to Oklahoma City to his barn, and that he would help dispose of the same and they would divide the money; that Sherman Shown gave them $10 to pay their railroad fare to Enid for this purpose; that they took the money and started to go to the depot and buy tickets to Enid, but missed the train that evening and went back to Shown's barn and stayed all night; that Shown was very much offended because they missed the train; that he said that he was not going to fur-

nish them any money if they did not do anything; that they left Oklahoma City early the next morning and went to Enid and stayed there on the 5th and 6th of July, and the next night this witness and John Lee entered the premises of A. Plumley and Mr. Owens in Enid and stole one bay gelding and one black gelding; that they took these horses out some ten or fifteen miles from Enid, where they stole a buggy and harness. from another man, hitched the horses to the buggy, and drove them on to Oklahoma City, arriving there on the evening of July 8th; that when they were near Belle Isle, north of Oklahoma City, John. Lee got out of the buggy and went into Oklahoma City and then returned and met this witness; that when Lee returned he was riding a pony that belonged to Sherman Shown; that the Plumley horse had given out, and they hitched the pony to the buggy and drove to Shown's wagon yard in the west part of Oklahoma City and put the horses in his wagon yard; that the stolen horses were kept there for several days, and Shown was there and saw them; that some days afterwards they sold the black horse that had been stolen from Mr. Owens to a Mr. Hoover, who worked for Mr. W. T. Hales, a horse buyer in Oklahoma City; that Sherman Shown was present when this horse was sold and helped to sell the same; that Mr. Hales gave his check in payment for this horse, for $100 payable to this witness; that the witness and Shown took the check and cashed it and afterwards took $75 of the money and deposited it in the American National Bank in Oklahoma City jointly so that each could draw it out if they wanted to; that after that Shown bought the bay horse that had been stolen from Mr. Plumley, paying this witness and John Lee $60 therefor, it being agreed that the horse was worth $90, and that the share of each of them, Shown, Terry, and Lee, would be $30 apiece. A short time after that this witness left Oklahoma City. Witness also testified that he did not tell about Shown's connection with this larceny until sometime after his arrest; that the first time he told it, except to his brother, was to Mr. McKeever, the county attorney of Garfield county; that he told it with the understanding that if he would tell the truth

about this matter Mr. McKeever would intercede for him and recommend to the court that if he would plead guilty to stealing the buggy and harness, and take a two-year sentence in the penitentiary, that the other charges would be dismissed.

The witness John Lee testified substantially to the same facts that the witness Lee Terry testified to.

D. A. Hoover testified: That he worked with Mr. W. T. Hales; that July 12, 1909, he bought a bay gelding from Lee Terry. That Sherman Shown came with Lee Terry to sell the horse which was a black gelding. Shown said that the boy was hard up, and needed to raise some money. They had the horse with them driving him to a single buggy. That a week after he had purchased the horse, Shown came there and asked him if we still had the horse.

"I told him that we did, and he said that we had better try to get rid of him; that we had better get him out of the way, because he understood that the officers were looking for him. I think the same evening, or the following morning, I had a conversation at the barn with him about the horse. He asked if we had got rid of him, and I told him he would have to see Mr. Hales; that I was simply buying for him. And after that I met him on the street, and he asked me what Mr. Hales said about it, and I told him that he said that he would not run off any stolen stuff."

Witness identified a check for $100 that was given in payment for the black horse, and stated that this horse was afterwards turned over to Mr. Owens of Enid, who identified him as the horse that was stolen from him.

Avery Harris testified that he lived at Oklahoma City and worked for W. T. Hales in the horse and mule business; that he knew Sherman Shown and saw him in July, 1909, and heard a conversation between him and Mr. Hales about a black horse that Mr. Hales had bought from Terry. Shown asked Hales if there was any way to switch him, or something like that.

"I told him that the sheriff had been there and identified the horse. Before that time I had heard Shown say that he believed that Tom Terry, brother of Lee Terry, would fix it if he would hold the horse."

James Brown testified: That he lived in Oklahoma City; was acquainted with the defendant Sherman Shown. That in July, 1909, he had hauled some brick for Sherman Shown and had helped him with a horse accident. That he was working for Mr. Michael unloading brick, and Mr. Shown came to him and asked Mr. Michael if he could help him (Shown) the next day, do some work for him.

"Mr. Michael told him that he could get me. So the next morning I got up and went to the restaurant where I boarded to wait for Mr. Shown, and he came in and told me to go out to the barn; that he had moved from California out on West Main. I went up there, and in about half an hour or an hour he rode up and ordered one of the boys to hitch up a horse and buggy, and told me that the animal we were driving would not stand much talking behind; that he was balky. I got in, and we drove off. The animal went all right. We went down Main street and turned, driving around by the Santa Fe depot back up Reno and back on California, then we turned straight west on California, went out by the Delmar Garden, and stopped. He left me with the horse and was gone a small space of time. I heard him talking. Pretty soon he came back, and another man came with him, and they stood off a small distance and talked. I could not hear what was said. The other man was Lum Deaton. He came and got in the buggy with me, and we drove on again to the west side of Delmar Garden. We drove probably a quarter of a mile, and he shook his head and looked kind of worried, and I asked him what was the matter, and he said nothing, and finally he said: 'That horse has cost me $120 or $125. I am shaky about it.' And he asked me in my judgment what I thought about it, and I laughed, and said for my part I would turn him loose and let them come and get him where he was at. We drove back to town, and he told me to go back after dinner to the restaurant. I went back, but he did not say anything to me, but that evening his brother-in-law came to me about 4 or 5 o'clock, and we went off together. We went back to the barn. He changed horses, and we went off in a buggy the second time. We made the same trip, but didn't go in the same direction. We met Lum Deaton on the road, and they stepped aside and talked between themselves, and then we came back to town again. I went to the barn, and I do not know where he went. He went off somewhere, and when he came back he told me to curry up the dun horse and carry the saddle and bridle down there and

then come on back. I did so, and when I got down there I could not find Lum Deaton. I took the saddle off and put it in the barn down there at the old Delmar Garden race track. Lum Deaton saw me as I was going back to town. I then went back to the barn and put the horse up, and shortly afterwards Shown came to the barn. I told him that Lum Deaton said he wanted me to go apiece of the way with him. Shown said, 'I can't see what that is for.' I said, 'Lum said, "It will save suspicion."' He said: 'Well, I will see about it. You come back after supper.' He says, 'You ride the pony and go part of the way with him.' I saddled up, left there, and went down to the Delmar Garden; went around; met Lum. He was saddling up the bay horse and had on his saddle when Mr. Shown came up. It was dark. He and Lum had a conversation, but I could not understand what was said. He told me to go as far as I thought was sufficient; that I would know when to turn back. He left me, and Lum and I started off. We went out south. I was riding Shown's pony, and Lum Deaton was riding the big bay horse weighing about 1,400 pounds. I have since seen the same horse on the streets here in Enid. We went south about a mile and a half, then turned east, and went over on Capitol Hill and turned south, and after we got on the hill we went about a quarter of a mile south, then we went two miles east, then a mile south, and two miles east, and a mile south. I went between seven and ten miles, then turned around, and went back to the city. Lum Deaton went on with the bay horse. I do not know where he went to."

Charles Hubatke testified: That he lived eight miles southeast of the town of Yukon in Canadian county, about twelve miles southwest of Oklahoma City. He was a farmer, and that he knew the defendant. That he saw him on the 20th day of October at his home west of Oklahoma City. That afterwards he came there with Mr. Plumley and got a big bay horse weighing 1,300 or 1,400 pounds, that had been traded to him. Witness said that he got this horse from a man who gave his name as L. C. Shood. He had never seen him before. It was along about the 20th or 25th of July that the witness traded two horses and $25 for the buggy and bay horse. That his two horses were brought back to him in October by the defendant Shown, the same horses that he had traded for the Plumley horse. That witness was sowing wheat when Shown came and told him he "had brought my team home. The team looked like they had the glanders. They laid

down, and one of them could not get up any more, so I killed him. Shown never paid me back any money. It was the next day that Shown came back with Mr. Plumley and I gave up the stolen horse."

A. Plumley, being recalled, testified that at Oklahoma City, after the defendant's arrest, he had a conversation with him before he found his horse. Mr. Dan Phillips was present.

"Mr. Shown said that he had not been able to get the horse, but that he thought he could, and he wanted to know if I got my horse if I would stop the prosecution of the case. and I told him that I would have nothing to do with that; that he would have to see the county about that."

Shirley Dyer testified that he was a deputy sheriff of Oklahoma county and knew the defendant, Sherman Shown; that he made a search for the two horses that had been stolen from Enid and recovered the black horse from W. T. Hales at his barn; that he had a conversation with Sherman Shown about the bay horse known as the Plumley horse; and that Shown at that time told him that he did not know anything about the horse.

The defendant took the stand on his own behalf and testified: That he was 42 years old, lived in Oklahoma City, engaged in the wagon yard business there, that he had lived in Shawnee, Norman, Stillwater, Chickasha, and Elk City, and that his business most all the time had been buying, selling, and trading horses. He was acquainted with Lee Terry and John Lee. That he never made any agreement with them to steal horses. That he did not have any conversation with them at his barn on the 4th day of July to steal horses either at Kingfisher or Enid or any other place, and that he would dispose of them and divide the profits. That on the day he had ordered them out of his barn for drinking. That John Lee had been working for him around the barn for about two weeks before that, and that Lee Terry had been working seven or eight days as stable boy and helper around the wagon yard. That they were not in his employ on the 4th of July, but had been discharged by him. That along about the 9th or 10th of July he met Terry and Lee on

Grand avenue and Broadway in Oklahoma City. This was the first time he had seen them since he had ordered them out of his barn, and they wanted to know if he would buy a team.

"I told them I was not able to buy one. They said they had a big heavy work team. I said, 'I am not able to buy a big heavy work team right now. And then I seen them again on Saturday on Robinson, and the team was tied up to a tree. Shorty Lee was standing there beside the buggy talking to a trader. He told me, 'This is that team.' I said, 'I am in a hurry and will be back pretty soon,' and I rode off. I saw that horse again at the auction corner at Broadway and California. It was about half past six that same Saturday. Both Lee Terry and John Lee were with them. They had sold the buggy and were leading the horses. At that time Shorty tried to sell me the team. I said, 'Shorty, I am not able to buy the team.' He said, 'Let me sell you this bay horse.' And we talked there quite a while. I said, 'I could work him with this other big bay horse, I suppose,' so I bought the bay horse from him and gave him $120 for it. He first asked me $150. I said: 'Shorty, he is too sore for that. He has been drove pretty hard on the pavement, hasn't he?' He says, 'I got him up about Guthrie, near Mulhall.' I paid him four $20 bills, and I think the others were $10's. Tom Jones was present. I took the bay horse and put him in my barn, and on Monday morning I led him out to grass, where I was herding my horses near Delmar Garden. Lum Deaton and Cal Boon had some horses down there. They were traders. The bay horse stayed in my barn Saturday night. The black horse came to my barn on Sunday. Lee Terry brought him there. Lee said: 'I can't get no buggy anywhere. Can I hire yours?' I said, 'If you don't tear it up, you can.' He said, 'I want to drive out to my brother-in-law's.' And I hired him the buggy, and he drove out to his brother-in-law's and was gone two or three hours. The Terry black horse was not left in my barn. I afterward traded the bay horse to Lum Deaton for a little bay mare and a mule, a buggy, and a set of single harness. I sold the mule to a man in the state of Arkansas for $80. I traded the little bay mare. I also traded Deaton a horse that I had bought from Mr. Doggett. The last time that I saw Lum Deaton was the next day after I had traded him the Doggett horse. Just before that I had met Charley Poles, a deputy sheriff, on the street, and he asked me if I knew Shorty Lee, and I told him, 'Yes.' He said 'Lee and Terry are arrested at Enid for stealing two horses, a buggy, and harness.' I said I thought Terry went out west and that Shorty

Lee went to Tennessee. 'No,' he said, 'they have got them in jail at Enid for stealing two horses, buggy, and harness up there, and two other fellows with them.' He said, 'Do you know anything about a big bay horse, 1,450 pounds, and a big black horse that they brought here?' and I said: 'No, sir; I do not know anything about that.' He said the big bay horse had one white hind foot. I did not think it was the horse I had, because the horse I had had two white hind feet; but this created some impression on my mind that I might have the stolen horse, so as soon as I heard it, I went over to Mr. Hales' barn and met Mr. Hoover on the street, and I says, 'Have you still got that horse you bought from Lum Deaton?' He says, 'Yes.' I says: 'They've got those boys in jail at Enid. I bought one of them, and you bought the other one. I have traded my horse.' Hoover says, 'You will have to talk to Mr. Hales.' So I drove on down to the barn and met Mr. Hales. What I said about switching was this: I said, 'We will have to switch this horse around until Tom came in, that is, the brother of Lee Terry, and let him make the horse good.' That evening I went to see Lum Deaton at the Delmar Garden, and I said to him: 'Lum, I understand the boys I got those horses from is in jail at Enid. Don't trade this horse off. He may be a stolen horse, I don't know.' He said, 'Very well.' I turned around and went off. I never thought any more about it until a few days after that Mr. Campbell, the sheriff from Enid, came down to Oklahoma City. He asked me if I knew those two boys, and I told him that I did. He said they were arrested for stealing two horses, and he gave a description of the horses as follows: A black horse and a bay horse with one white hind foot. I says, 'I did not buy that horse.' He says, 'Yes, you did.' I says: 'I beg your pardon; I bought a horse with two white hind feet and a star in his forehead.' I told him that I thought I could find the horse, told him that I did not know, but I would see, so the next morning I went to find Lum Deaton, and he was gone. That was the first knowledge that I had that he was gone. I told him that I had traded the horse to Lum Deaton. I did not tell them where Lum Deaton was. I agreed to report to them again. They arrested me, and at the depot they turned me loose, and I told them that I would do what I could to find the horse, and I told them that I would meet them the next morning. I was turned loose in the afternoon at 3:45, and was to meet them at the Rock Island depot and come to Enid the next morning, if I did not find the horse. The next morning I went to the Rock Island depot and met Mr. Plumley and come on to

Enid. I stayed in jail there four or five nights and gave bond. After I gave bond I went back to Oklahoma City and tried to locate Lum Deaton and find the horse. I found that Lum Deaton went to Shawnee. I got on a trade with Cal Boon, the Indian that owned the camping grounds out at Delmar Garden. I traded him a bay horse for a black mare and a black horse. This was three or four days after I had got back from Enid. At that time I did not learn anything about these horses. I hitched them up and worked them for some time on street work, and found that one of them was a little short winded, so I went to Cal Boon and asked him about it. He said the man that traded this team to him, Lum Deaton, said the horses were all sound. I said, 'How's that?' He said, 'This is the team Lum Deaton traded that bay horse for.' I said, 'The hell it is.' I understood that the horses were traded for down southeast somewhere, and I asked Jim Brown which way he went off with Lum Deaton that night, and he told me in the Black-jacks, so I took this team that I had gotten from Cal Boon and started out in that country, trying to see if I could find the owner. I finally met an old cowboy, and he said, 'Where have you been?' And I said, 'I have been out trying to locate this team to get a horse that I bought that was stolen and traded for this team,' and he said, 'Haven't you got sense enough to let a team like that find their home?' And I says: 'I haven't done it yet; I have looked in the neighborhood of 60 days.' He says, 'If you will turn that team loose and get in behind them, that old mare and horse will go straight home.' I says, 'I never had sense enough to do that yet.' He says, 'You hitch up your wagon and come and go with me and we will find that horse.' We hitched up the wagon. I started out. Got to Tuttle, eighteen or twenty miles. It was the first Monday, and the farmers were over trading with others—having an auction sale. I stopped and asked the farmers if they knew that team, and they said they did not know it. We drove on that way, and a bridge was out about half a mile this side of Mr. Hubatke's. The mare and the horse started that way. I said, 'That bridge is out, and I can't go that way, but I will follow that team.' We went north from there. We came to Mr. Hubatke's place, and Mr. Hubatke was coming up from the field working this horse. He had another horse and a pair of mules, and my team turned in to Mr. Hubatke's place. I got off and spoke to him. I says, 'What is that horse worth?' He said, '$175.' I said, 'Mr. Hubatke, I am sorry to tell you he is a stolen horse from what I understand.' 'Well,' he said, 'I have been looking for that quite a while.' I

came to Oklahoma City then, and phoned to Mr..Plumley to come at once. The next day I took Mr. Plumley out to the place, and Mr. Hubatke turned the horse over to him."

In explanation of the money that was deposited in the American National Bank in Oklahoma City, the witness admitted that. he was there when the money was deposited in the bank, but said that it was put in their names jointly, so that he could give the money to his brother Tom, after Lee Terry went out west.

On cross-examination the defendant admitted that he did not draw the $50 balance of this money and pay it to Tom Terry until after he had been arrested and charged with this larceny, and after he knew that Lee Terry and John Lee had been arrested for the larceny.

The record is very voluminous, about 600 pages. The foregoing, however, is a substantial synopsis of the material testimony in the case.

*Rush & Steen* and *J. W. Johnson,* for plaintiff in error.

*Chas. West,* Atty. Gen., and *Smith C. Matson,* Asst. Atty. Gen., for the State.

DOYLE, J. (after stating the facts as above). The only contention made by counsel for plaintiff in error in their brief now before us is directed to the insufficiency of the evidence to support the verdict and judgment of conviction. There is no indication or even a suggestion that the other assignments of error are well founded, and a careful inspection and examination of the record fails to disclose that any error was committed by the court during the progress of the trial.

Counsel in their brief say:

"The crime of stealing a bay horse was complete as soon as Lee took him into his possession and started for Oklahoma City, and there is absolutely no testimony connecting the defendant with the commission of this crime. The only thing that could be claimed under the testimony is that it might tend to prove that Shown was guilty of the crime of receiving stolen property, but under the circumstances the mere possession of the horse is not such a corroboration as ought to sustain a conviction because that possession might have been innocent."

We think this contention is wholly without merit. There was ample proof of the actions, conduct, and incriminating admissions of the defendant corroborative of the testimony of his accomplices, Lee and Terry. There can be no reasonable doubt, in the light of the evidence, of the defendant's guilt in this case. It has been uniformly held by this court that, when the record discloses substantial evidence to support the verdict of the jury, this court will not undertake to retry the questions of fact.

On the whole case, we are clearly of the opinion that the appeal in this case is destitute of merit. The judgment of the district court of Garfield county is therefore in all things affirmed, and the cause remanded thereto, forthwith, with direction to enforce its judgment therein.

FURMAN, P. J., and ARMSTRONG, J. concur.